[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTIONS TO CONFIRM AND VACATE ARBITRATION AWARD
This arbitration was a "Last-Best-Offer" (L.O.B.) under C.G.S. §5-270, et seq. in regard to some 131 issues arising from the parties failed negotiations to settle their collective bargaining differences. Before arbitration they had resolved 93 of those issues and sent only 38 issues to the arbitrator to be decided under C.G.S. § 5-276. The plaintiff appeals only as to the issue numbered 46 which involves Alternative Work Schedules, a/k/a flex-time.
Plaintiff's appeal is under C.G.S. §§ 5-276a(e)(4) (A-F) and52-418 (a) (1-4).
 FACTS
This matter was sent to arbitration under C.G.S. § 5-276a. Hearings commenced before the arbitrator on all unresolved issues pertaining to wages, hours and other condition of employment on October 19, 1999, and continued on 1, and 5, 1999, December 7 and 23, 1999, January 5 and 31, 2000, February 9 and 15, 2000, and March 4, and 17, 2000. The parties were permitted to present witness testimony and evidence. At the conclusion of the arbitration hearings the parties filed their last best offers on each unresolved issue, including Issue 46, on April 7, 2000. The parties' briefs were filed on April 14, 2000.
The existing article in the collective bargaining agreement addressing the flex-time issue is found at Article 16A. Under compulsory L.O.B. binding interest arbitration the arbitrator is required by law to consider the last best offers submitted by the parties on each unresolved issue. Conn. Gen. Stat. § 5-276a(e)(3). CT Page 12273
Article 16A had 4 sections in the then existing agreement. The Union's L.O.B. was as follows:
 Article 16a, Alternative Work Schedules, Section 1. The State shall continue to implement and operate for all employees in all agencies, AWS work schedules, the degree of employees' free choice and band-with may vary from agency to agency, sub unit to sub unit, but the preference shall be for maximum employee free choice where feasible.
 [New]
 [a] Effective sixty (60] days following legislative approval of this agreement, each State agency shall notify the Union of its alternative work schedule menu of options available to employees working thirty-five [35] or more hours per week. Said menu of options may include any/all of the following:
 1. Unrestricted daily starting/quitting time; around a core hour structure. [Pure flex time]
2. Four day workweek.
3. Five/four or four/five by-weekly fixed schedule.
 4. Any other variation deemed appropriate by the parties.
5. Weekly variable starting and quitting time.
 An agency must submit written justification to the Office of Labor Relations based upon provable business necessity, for the exemption of any employee, unit, division, or program from an alternative work schedule option. The office of Labor Relations shall notify the Union of any such claimed exemption. Upon request, the parties shall meet and discuss the claimed exemptions within thirty [30] days.
 [b] Assignment to any variation of the standard workweek, is not considered an alternative work schedule.
CT Page 12274 [c] There shall be a AWS facilitator who shall be knowledgeable in flexible schedule issues. The facilitator shall be available to or solve such matter as are set forth hereafter. The State and Union shall share equally the facilitator's expenses.
 [d] Each agency shall empower a AWS committee of at least one representative of the Union and the agency. The Committee shall review and vote upon all new and/or revised, AWS programs and offerings. No dispute shall be deemed right for arbitration until the committee has reviewed same; or has failed to meet with fifteen [15] days of notice of pending dispute.
 [New] Section 2. Additional Options
 [a] Agencies are encouraged to provide the maximum of AWS and AWS menu options to eligible employees, on a pilot project basis. Pilot projects may be limited to specific number of employees identified by the appointing authority in consultation with the Union. Pilot projects shall remain in place for a period of not less than six [6] months. Pilot projects may have an identified beginning date, and expiration date. Prior to the expiration of the six months, an individual employee may opt out of the pilot project. Within thirty days of the end of the trial period, the agency shall notify the Union of its' intent to terminate the pilot project, along with the reasons for said termination. The Union may submit said demand for termination to the AWS facilitator who may issue a non-binding recommendation regarding the termination, continuation or modification of said program, prior to the submission of the dispute directly to arbitration.
 Section 3. Reduction and/or Elimination
 Except as otherwise provided herein, the employee and the Union must receive not less than ten [10] days' notice of an agency's intent to modify, suspend, or discontinue any alternative work schedule. Agencies may reduce, or eliminate alternative work schedules based upon written supportive factual evidence of one or more of the following:
CT Page 12275 [a] Increased cost or unduly burdensome
[b] Inconvenience or decrease in service to the public
[c] Decrease in work productivity
 [d] Inability of the employer to maintain or sustain adequate staffing levels.
 Except as otherwise provided herein, a reduction or elimination of an alternative work schedule is subject to direct arbitrable appeal pursuant to the arbitration provisions of this agreement, but shall not be deemed ripe for submission until the AWS facilitator has reviewed same, and issued a non-binding opinion thereon.
 Section 4. Individual Options
 [a] An employee who can demonstrate for a non-AWS option, schedule modification based upon child care responsibilities, elder care, family or personal medical condition or treatment, or other care obligations, educational programs, car pooling or mass transportation considerations, shall be accommodated whenever possible. The AWS facilitator shall have binding authority to resolve these disputes. Such requests shall be reviewed quarterly.
 [b] Employees shall qualify for said accommodation unless the agency can establish that the employee has demonstrated a pattern of a lack of dependability during the preceding twelve [12] months. Said pattern must have been documented in writing, and the employee must have been provided with an opportunity to acknowledge receipt of said documentation. Management shall give due consideration to whether the grant of said schedule might logically cure the dependability problem.
 [c] The appointing authority may revoke the preferred schedule if an employee has been found to have misconducted him/herself in any manner with respect to the schedule. The removal of said schedule shall be stayed until the matter can be reviewed initially by the AWS facilitator, who may issue an interim order CT Page 12276 regarding the schedule period. Said order shall be limited to the issue of whether the stay should continue pending submission of the threshold issue to the [disciplinary] arbitrator [grievance panel].
 Section 5. Conflicts
 Whenever possible, Article 12 "Seniority" shall apply in resolving conflicts between similarly classified employees and competing requests for schedules. Medical requests, ADA accommodations, and employee performance shortcoming considerations are examples of agreed exception to the seniority rule.
The State's last best offer simply proposed a "new section" that had no number, as follows:
New Section:
 An unscheduled workweek for full-time employees shall be a work schedule of fort 40 hours with he starting and ending time determined by the requirements of the position. It is understood that management reserves the right to a determine the requirements of the position, and (b) to establish core hours in unscheduled work week situations.
In L.B.O.'s on issues 43C and 127 submitted by the State new language was submitted as new sections. There was no express deletion of other sections within particular articles. In neither issue 43C nor issue 127 did the arbitrator read the State's proposed new section as eliminating the remaining language in each entire article, i.e., Articles 16 and 38, respectively.
Among the initial proposals of the State as submitted on February 16, 1999, was the State's proposal concerning Article 16a, which was to "delete entire article".
The parties' respective positions on Issue 46 as submitted to the arbitrator at the outset of arbitration was as follows:
 Union Proposal Article 16a Flex Time — (eliminate old section: see attached new section)
 State Proposal Article 16a Flex Time — eliminate entire provision
CT Page 12277
In the State's post-hearing brief it clearly sought to maintain the status quo on the flex-time issue saying:
 "The proper place to begin the examination of this issue is the current language found at Article 16A. An examination of the status quo language reveals that the Union has what it claims it lacked, i.e., an enforcement mechanism. . . . Section One of the current language indicates that flextime was not intended to be a one-shot deal. Rather, it was intended to be a fluid ongoing proces. "The State shall continue to implement and operate for employees in all agencies, flextime work schedules." Clearly there is some obligation for the State to do some thing, but there are also limits. "The degree of employee free choice and band-width may vary from agency to agency or subunit to subunit, but the preference shall be for maximum employee free choice where feasible." Clearly, the language hints at "pure" or "real" flextime wherein an employee is able to vary the daily starting and ending time based upon the requirements of the position, but it is that degree of free choice that the Union urges has never come to fruition.
After the last best offers were filed the parties filed briefs. In its brief the State did not claim that its last best offer included the flex-time language from the parties' previous collective bargaining agreement.
On April 24, 2000 the arbitrator issued his award, including five numbered lengthy sections for Article 16A, re issue 46, and said:
"Award: The Union's last best offer is accepted."
The award was approved by the legislature under C.G.S. § 5-27 on June 19, 2000.
 LAW
We must first decide if this arbitration was voluntary or mandatory. C.G.S. § 5-276a(c) and (d), when read together, indicate that the arbitration is mandatory. Thus the standard of review is higher. AmericanUniversal Ins. Co. v. DelGreco, 205 Conn. 178, 187-188. This court is thus obliged to "conduct a de novo review of the interpretation and CT Page 12278 application of the law of the" arbitrator. id 191.
In mandatory arbitration the arbitrator may not either implicitly or explicitly disregard controlling principles of constitutional, statutory or judge-made law, American Universal Ins. Co. v. DelGreco, id 187-188, and this court is only to review "the interpretation and application of the law by the arbitrators". id 191.
Although the plaintiff and the arbitrator suggest that the arbitrator should not consider the rejected counter-offers made by the state, C.G.S. § 5-276a(e)(5) suggests that the history of the negotiations should be considered. What the arbitrator considers is his decision to make and although some court might use the material before the arbitrator differently courts should not retry the case if the award conforms the statutory submission. Here it does conform.
As plaintiff points out in its of July 17, 2000 C.G.S. § 5-276a(e) (4) provides that "the arbitrator shall select the more reasonable last best offer on each of the disputed issues . . .". The plaintiff wants this court to consider under all of the facts if the arbitrator's choice was reasonable. This we cannot do.
Under C.G.S. § 52-418 (a) this court may only vacate an award if it finds one of the four defects there recited. The award contains no such defects nor has plaintiff sustained its burden of proof as to the existence of any defect.
The application to vacate is denied. The application to confirm is granted.
Norris L. O'Neill, J.